## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*<br>GARRETT ARNOLD<br>2516 Williams Creek Road<br>High Ridge, Missouri, 63049<br><br>                              Plaintiff-Relator,<br><br>BRINGING THIS ACTION ON BEHALF<br>OF THE UNITED STATES OF AMERICA<br>THE DISTRICT OF COLUMBIA,<br>THE STATE OF MARYLAND, and<br>THE COMMONWEALTH OF VIRGINIA<br><br>c/o<br><br>CIVIL-PROCESS CLERK<br>OFFICE OF THE UNITED STATES ATTORNEY<br>555 4th Street, NW<br>Washington, DC 20530<br><br>ATTORNEY GENERAL OF<br>THE UNITED STATES<br>U.S. Department of Justice<br>950 Constitution Avenue, N.W.<br>Washington, DC 20530<br><br>ATTORNEY GENERAL FOR<br>THE DISTRICT OF COLUMBIA<br>441 4th Street NW, Suite 1060 N<br>Washington, DC 20001<br><br>ATTORNEY GENERAL FOR<br>THE STATE OF MARYLAND<br>200 St. Paul Place<br>Baltimore, MD 21022<br><br>ATTORNEY GENERAL FOR<br>THE COMMONWEALTH OF VIRGINIA<br>900 East Main Street<br>Richmond, VA 23219<br><br>v. | No._____<br><br><br>**COMPLAINT**<br>**AND JURY DEMAND**<br><br>FILED **UNDER SEAL**<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2)<br><br>DO NOT PUBLISH |

1

| | |
|---|---|
| PROVIDENCE HOSPITAL<br>1150 Varnum Street,<br>N.E. Washington, DC, 20017, | )<br>)<br>)<br>)<br>) |
| ASCENSION HEALTH ALLIANCE<br>D/B/A ASCENSION<br>101 South Hanley Road, Suite 450<br>St. Louis, Missouri 63105, | )<br>)<br>)<br>)<br>) |
| ASCENSION HEALTH<br>4600 Edmundson Road,<br>St. Louis, Missouri, 64134, | )<br>)<br>)<br>) |
| PRIME PAD LLC, LLC<br>12200 Annapolis Road, Suite 123<br>Glen Dale, MD 20769, | )<br>)<br>)<br>) |
| - and - | )<br>) |
| KWASI DEBRA<br>12200 Annapolis Road, Suite 123<br>Glen Dale, MD 20769,<br>Defendants. | )<br>)<br>)<br>)<br>) |

## COMPLAINT

## I.   JURISDICTION AND VENUE

1.   This action arises under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*

2.   This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, and supplemental and pendant jurisdiction.

3.   Plaintiff-Relator also brings this action on behalf of the District of Columbia, the State of Maryland and the Commonwealth of Virginia, hereinafter collectively referred to as "the States."

4.  Plaintiff-Relator brings this action for the Defendants' violations of the District of Columbia False Claims Act, DC Code, §§ 2-381.01 *et seq.,* Maryland False Health Claims Act, Md. Code Ann. Health-Gen. §§ 2-601 *et seq.*, The Maryland False Claims Act, Md. Code Ann. Gen. Prov. §§ 8-1-101 *et seq.*, and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.* Hereinafter these laws will be collectively referred to as the "State False Claims Acts."

5.  Jurisdiction over claims under the State False Claims Acts is also conferred by 31 U.S.C. § 3732(b) in that the transactions and occurrences described, which violate the State False Claims Acts, involve a common nucleus of facts as, and are related to those that violate the Federal False Claims Act.

6.  Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because the Defendants regularly transact business in this District, and did so at all times relevant to this Complaint. At least one Defendant also maintains offices within this jurisdiction.

## II.  PARTIES

### A.   Plaintiff-Relator

7.  Plaintiff-Relator Garrett Arnold ("Plaintiff-Relator") resides at 2516 Williams Creek Road, High Ridge, Missouri, 63049.

8.  Plaintiff-Relator has extensive experience conducting audits of hospital coding and billing procedures.

9.  Plaintiff-Relator served as an audit manager for CHAN Healthcare, the consultant charged with auditing Providence Hospital and affiliated organizations from May 2012 until early 2014.

10. This suit is not based upon prior public disclosures found within sources of allegations or transactions that are encompassed by the definition of the term "publicly disclosed" under 31 U.S.C. § 3730(e)(4)(A).

11. Plaintiff-Relator is an original source of all the information contained in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(B) and the State False Claims Acts.

12. Plaintiff-Relator has independent knowledge of all the information contained herein, and Plaintiff-Relator has voluntarily provided such information to the United States as well as the above listed States prior to filing this action.

**B.    Defendants**

13. Defendant Providence Hospital, of 1150 Varnum Street, N.E. Washington, DC 20017, is part of the Ascension Health System, according to its website. It is a 408-bed hospital and has affiliated providers.

14. Defendant Ascension Health of 4600 Edmundson Road, St. Louis, Missouri, 64134, is registered as a nonprofit corporation with the Missouri Secretary of State.

15. Defendant Ascension Health Alliance of 101 South Hanley Road, Suite 450, St. Louis, Missouri 63105 is listed in filings with the Missouri Secretary of State as the owner of the business name "Ascension." The Ascension Health Alliance d/b/a Ascension, Consolidated Audited Financial Statements for years ended June 30, 2014 and 2013 lists itself as the owner of Ascension Health, which is described as a Catholic national health system consisting primarily of nonprofit corporations that own and operate local healthcare facilities, or Health Ministries,

4

Located in 23 of the United States and the District of Columbia. Hereinafter Ascension Health, Ascension Health Alliance, Ascension and related entities are collectively referred to as "Ascension." Ascension also was an owner of CHAN Healthcare during much of the time Plaintiff-Relator was employed by CHAN Healthcare.

16.    Defendant Prime Pad, LLC, of 12200 Annapolis Road, Suite 123, Glen Dale, MD 20769, is the owner of property rented to Providence Hospital from which affiliated physicians bill.

17.    Defendant Dr. Kwasi Debra, of 12200 of Annapolis Road, Suite 123, Glen Dale, MD 20769, is the owner of Prime Pad, LLC.

## III.    FACTUAL ALLEGATIONS

### A.    Summary of Allegations

18.    While working as an auditor, Plaintiff-Relator learned Providence Hospital and affiliated organizations were in violation of basic requirements to charge government programs using provider-based billing rates.

19.    Plaintiff-Relator advised officials of Providence Hospital that in order to qualify for provider-based billing, the hospital was required to keep appropriate financial accounting.

20.    He recommended, among other reforms, that professional and technical component bills should be accounted for separately, and that bills should be accounted for using a Balance Sheet, Profit and Loss Statement, and an Income Statement.

21.    Providence Hospital failed to adhere to these basic accounting requirements.

22.   Instead, Providence Hospital comingled and obscured cost center information, making it impossible even for experienced auditors to determine the sources and uses of Providence Hospital funds.

23.   CMS pays a premium for provider-based bills, over what can otherwise be charged for the same service.

24.   The only difference, allowing for the higher rates billed through this system, is the qualification of the billers to use provider-based rates.

25.   The regulations for provider-based billers require accounting for cost centers.

26.   Officials of Providence Hospital did not merely fail to handle accounts properly, but also engaged in activity designed to obscure accounting records.

27.   High-ranking executives decided to change cost center designations every quarter, specifically to obscure the finances of Providence Hospital, its Physicians Health Services, and affiliated organizations.

28.   Even upon being advised of these issues, the Defendants failed to implement procedures to fix accounting practices, to comply with provider-based billing regulations.

29.   In addition, the credentials of health care providers were not kept properly to be able to determine which physician provided care to a patient, making it impossible to justify many bills for physician services.

30.   The Plaintiff-Relator also found rental agreements, in violation of Stark Law and Anti-Kickback statute requirements.

31.   The rental agreements did not include the appropriate amount of rent required for the property.

32.   Satellite offices failed to inform patients of the relationship they had with Providence Hospital, which is also a requirement of provider-based billing.

33.   The Plaintiff-Relator discovered bills for services, which had been charged as if the services had been provided at satellite offices, but the services were either not provided at all or were provided at Providence Hospital.

34.   Additionally, Plaintiff-Relator discovered that Defendants were charging as if the services were provided from more affluent satellite locations meaning that Providence Hospital could bill at higher rates, as a different location provides a higher reimbursement under CMS rates.

35.   To the best of Plaintiff-Relator's knowledge, all the issues identified herein had been occurring since before he began to conduct his audit work on behalf of CHAN Healthcare in May 2012.

36.   Plaintiff-Relator has every reason to believe the issues identified in this Complaint to be ongoing and continuous violations, as no steps towards corrective action were taken during his tenure with CHAN Healthcare.

37.   Plaintiff-Relator was terminated as a result of raising these concerns in the first quarter of 2014.

38.   The issues identified by Plaintiff-Relator create false claims, with resulting damages to the government of the United States as well as to the governments of the District of Columbia, Maryland, and Virginia.

39.   Accordingly, Plaintiff-Relator files this action under the *qui tam* provisions of the Federal False Claims Act. 31 U.S.C. §§ 3729 *et seq.*, on behalf of the United States to recover damages and penalties resulting from false claims.

40.     Plaintiff-Relator also brings the action on behalf of the District of Columbia, Maryland, and Virginia to recover damages and penalties for violations of the laws of those jurisdictions, including, but not limited to, DC. Code §§ 2-381.01 *et seq.*, Md. Code Ann. Health-Gen §§ 2-601 *et seq.*, Md. Code Ann. Gen. Prov. §§ 8-1-101 *et seq.*, and Va. Code Ann. §§ 8.01 *et seq.*,

**B.      Regulatory Structure**

**1.      Provider-based Billing**

41.     Provider-based, as defined under 42 CFR § 413.65, includes requirements that Providence Hospital, its Physicians Health Services, and satellite facilities violated, including but not limited to, the following:

> 42 CFR §413.65(d) *Requirements applicable to all facilities or organizations.* Any facility or organization for which provider-based status is sought, whether located on or off the campus of a potential main provider, must meet all of the following requirements to be determined by CMS to have provider-based status.
>
> ...
>
> 42 CFR §413.65(d)(3) *Financial integration.* The financial operations of the facility or organization are fully integrated within the financial system of the main provider, as evidenced by shared income and expenses between the main provider and the facility or organization. The costs of a facility or organization that is a hospital department are reported in a cost center of the provider, costs of a provider-based facility or organization other than a hospital department are reported in the appropriate cost center or cost centers of the main provider, and the financial status of any provider-based facility or organization is incorporated and readily identified in the main provider's trial balance.
>
> 42 CFR §413.65(d)(4) *Public awareness.* The facility or organization seeking status as a department of a provider, a remote location of a hospital, or a satellite facility is held out to the public and other payers as part of the main provider. When patients enter the provider-based facility or organization, they are aware that they are entering the main provider and are billed accordingly.

42 CFR §413.65(e) *Additional requirements applicable to off-campus facilities or organizations.* Except as described in paragraphs (b)(2) and (b)(5) of this section, any facility or organization for which provider-based status is sought that is not located on the campus of a potential main provider must meet both the requirements in paragraph (d) of this section and all of the following additional requirements, in order to be determined by CMS to have provider-based status.

…

42 CFR §413.65(e)(2) *Administration and supervision.* The reporting relationship between the facility or organization seeking provider-based status and the main provider must have the same frequency, intensity, and level of accountability that exists in the relationship between the main provider and one of its existing departments, as evidenced by compliance with all of the following requirements:

(i) The facility or organization is under the direct supervision of the main provider.

(ii) The facility or organization is operated under the same monitoring and oversight by the provider as any other department of the provider, and is operated just as any other department of the provider with regard to supervision and accountability. The facility or organization director or individual responsible for daily operations at the entity—

(A) Maintains a reporting relationship with a manager at the main provider that has the same frequency, intensity, and level of accountability that exists in the relationship between the main provider and its existing departments; and

(B) Is accountable to the governing body of the main provider, in the same manner as any department head of the provider.

(iii) The following administrative functions of the facility or organization are integrated with those of the provider where the facility or organization is based: billing services, records, human resources, payroll, employee benefit package, salary structure, and purchasing services. Either the same employees or group of employees handle these administrative functions for the facility or organization and the main provider, or the administrative functions for both the facility or organization and the entity are—

(A) Contracted out under the same contract agreement; or

(B) Handled under different contract agreements, with the contract of the facility or organization being managed by the main provider.

42 CFR §413.65(e)(3) *Location.* The facility or organization meets the requirements in paragraph (e)(3)(i), (e)(3)(ii), (e)(3)(iii), (e)(3)(iv), (e)(3)(v), or, in the case of an RHC, paragraph (e)(3)(vi) of this section, and the requirements in paragraph (e)(3)(vii) of this section.

(i) The facility or organization is located within a 35-mile radius of the campus of the hospital or CAH that is the potential main provider.

(ii) The facility or organization is owned and operated by a hospital or CAH that has a disproportionate share adjustment (as determined under §412.106 of this chapter) greater than 11.75 percent or is described in §412.106(c)(2) of this chapter implementing section 1886(d)(5)(F)(i)(II) of the Act and is—

(A) Owned or operated by a unit of State or local government;

(B) A public or nonprofit corporation that is formally granted governmental powers by a unit of State or local government; or

(C) A private hospital that has a contract with a State or local government that includes the operation of clinics located off the main campus of the hospital to assure access in a well-defined service area to health care services for low-income individuals who are not entitled to benefits under Medicare (or medical assistance under a Medicaid State plan).

(iii) The facility or organization demonstrates a high level of integration with the main provider by showing that it meets all of the other provider-based criteria and demonstrates that it serves the same patient population as the main provider, by submitting records showing that, during the 12-month period immediately preceding the first day of the month in which the application for provider-based status is filed with CMS, and for each subsequent 12-month period—

(A) At least 75 percent of the patients served by the facility or organization reside in the same zip code areas as at least 75 percent of the patients served by the main provider; or

(B) At least 75 percent of the patients served by the facility or organization who required the type of care furnished by the

main provider received that care from that provider (for example, at least 75 percent of the patients of an RHC seeking provider-based status received inpatient hospital services from the hospital that is the main provider).

42.   These regulations are mandatory for an entity to bill under provider-based rates.

43.   However, there is a voluntary attestation process regarding provider based biling

to claim compliance with these regulations.

44.   There are additional consequences for an organization that fails to attest and is

later found to be billing wrongfully:

Effective October 1, 2002, the mandatory requirement for provider-based determinations under §413.65(b) has been replaced with a voluntary attestation process. Providers are no longer required to apply for and receive a provider-based determination for their facilities prior to billing for services in those facilities as provider-based. However, under §413.65(b)(3), a provider may choose to obtain a determination of provider-based status by submitting an attestation stating that the facility meets the relevant provider-based requirements (depending on whether the facility is located on campus or off campus). Providers who wish to obtain such a determination of provider-based status for their facilities after October 1, 2002, should do so through the self-attestation process.

…

Effective October 1, 2002, (or, for grandfathered facilities, effective for the potential main provider's first cost reporting period starting on or after July 1, 2003), an attestation of provider-based status, if approved, would result in a determination that a facility or organization is provider-based.

If CMS subsequently discovers that the facility for which an attestation has been made and approved in fact does not meet the provider-based rules, then CMS would not recover all past payments for periods subject to reopening, but instead would recover only the difference between the amount of payment that actually was made since the date the complete attestation for a provider-based determination was submitted and the amount of payments that CMS estimates should have been made in the absence of compliance with the provider-based requirements during that time period. For example, if a facility opens and begins billing as provider-based on October 1, 2002, and the potential main provider submits an attestation on December 1, 2002,

and the attestation is disapproved by CMS on February 1, 2003, then CMS will only recover the overpayments since December 1, 2002. In addition, at the time that CMS determines that a facility, that submitted a complete attestation, is actually not provider-based, payment would continue for up to 6 months but only at a reduced rate as described at §413.65(j)(5). However, if that main provider had not submitted an attestation and CMS determined that the facility is not provider-based, CMS would recover the overpayment for the period beginning October 1, 2002.

It could also benefit the provider to self-attest and obtain a determination because, under §413.65(l)(1), where a material change subsequently occurs in the relationship between the facility or organization and the main provider, and the main provider properly reports the material change to CMS, then treatment of a facility as provider-based would cease only with the date that CMS determines that the facility no longer qualifies for provider-based status. By contrast, a provider that does not self-attest at all, or does obtain a determination but fails to report a subsequent material change in its relationship with the facility, could face a recovery of the difference between provider-based and freestanding payment (i.e., the overpayment). For example, if a main provider opens a facility and begins billing as provider-based on October 1, 2002, but does not submit an attestation nor does the facility qualify as provider-based under § 413.65, and CMS discovers on February 1, 2003 that the main provider is billing inappropriately as provider-based, then CMS will recover the overpayments since October 1, 2002.

CMS Program Memorandum Transmittal A-03-030, April 18, 2003.

45.     Notwithstanding the potentially voluntary attestation process, provider-based status is required to bill for services and obtain the higher compensation that status affords. In addition, the Plaintiff-Relator's evidence is that the Defendants knowingly took actions, which violated provider-based billing requirements, as opposed to truthfully attesting to facts, which might later be determined to not qualify them for such status.

46.     To the extent the Defendants filed such attestations, they would have done so knowing that the attestations were not in compliance and, thus, those attestations

violate the False Claims Act as material false statements under 31 U.S.C. § 3729(a)(2).

> **2.  Stark Law and the Anti-Kickback Statute**

47.    The Medicare-Medicaid Self-Referral Statute, 42 U.S.C. § 1395nn *et seq.*, known as the "Stark Law," prohibits paying remuneration to physicians for referring patients to a provider where the referring physician has a nonexempt "financial relationship" with the provider. 42 U.S.C. § 1395nn(a)(1), (h)(6).

48.    The Stark Law also prohibits payment of Medicaid claims rendered in violation of its provisions.  42 U.S.C. § 1395nn(a)(1), (g)(1).

49.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b also prohibits any payments to influence referrals and, among other penalties, creates liability for such payments as violations of the False Claim Act.

> **C.  Plaintiff-Relator's Findings**

> **1.  Account information systematically obscured**

50.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

51.    Plaintiff-Relator found systematic accounting failures, making tracking costs impossible despite the requirements of provider-based billing. 42 CFR § 413.65(d)(3).

52.    Plaintiff-Relator drafted his memorandum in March 2013 and it was circulated to Providence Hospital officials in April 2013.

53.   Plaintiff-Relator's findings described how Providence Hospital could not possibly be considered to be maintaining even minimal financial accounting practices to ensure compliance with provider-based billing regulations.

54.   In early 2013 Plaintiff-Relator first learned the opaque financial accounting practices were the result of deliberate action to obscure the financial status of Providence Hospital and change the financial position of its internal division referred to as Physicians Health Services ("PHS").

55.   Plaintiff-Relator discovered the software Providence Hospital was in the process of implementing to handle accounting and scheduling had not been programed with cost center codes necessary to comply with provider-based billing requirements:

> No cost centers in ECW.  This is creating a host of issues though it is our understanding that discussions are underway to move forward on this.  Not sure as to implementation plans or timing.
>
> Arnold Memorandum of Accounting Issues, p. 5.

56.   ECW was a project that started late in 2012 and was fully implemented approximately October 2013.

57.   The ECW system was supposed to integrate with the physicians' codes for billing and scheduling.

58.   However, despite its full implementation, Providence Hospital still did not have any cost centers programmed into this system.

59.   At least until such cost centers could be implemented, Providence Hospital could not have the capacity to comply with provider-based billing requirements as it

was not possible for it to track income and expenses on a cost center basis as required.

60.  After Plaintiff-Relator identified this problem and reported it, there still was not any action to implement cost centers in ECW.

61.  The lack of cost centers in the ECW system continued actions by executives that obscured cost centers, which had been ongoing for years.

62.  Officials, including Senior Accountant Mary Wilson, informed Plaintiff-Relator that Providence Hospital and Physician Health Services changed cost center designations every quarter.

63.  Plaintiff-Relator confirmed this was the case with the controller and other officials.

64.  Providence Hospital changed cost center designations constantly at the direction of Fahad Tahir, the Senior Vice President of Physician Health Services.

65.  Mr. Tahir, in theory, had no responsibility for accounting, but Rick Talento, the C.F.O., ceded authority to Mr. Tahir.

66.  The quarterly changes in cost center designation served one main purpose; namely to hide losses of Providence Hospital, and for Physician Health Services, and thereby making it possible for executives including Mr. Tahir to obtain bonuses based on (false) financial performance.

67.  This deliberate decision to obscure cost center designations rendered compliance with provider-based billing regulations impossible.

68.  There was no way to be sure that cost centers were accurate, since they were changed quarterly and no way to ensure that "the financial status of any provider-

based facility or organization is incorporated and readily identified in the main provider's trial balance," as required by 42 CFR § 413.65(d)(3).

69. There was no way to maintain documentation, which could demonstrate that this requirement was fulfilled.

70. By obscuring these issues, Mr. Tahir was able to claim losses were constrained to the technical billing side of the hospital accounts, rather than impacting the professional services billing.

71. The financial performance of professional services is what affected Mr. Tahir's personal bonus.

72. Plaintiff-Relator also found significant issues with how revenue and expenses were handled as between Providence Hospital ("PH") for the technical component of bills and the Physician Health Services ("PHS") for the professional component of bills for physicians affiliated with the hospital.

73. Indeed, Plaintiff-Relator found unreconciled balances throughout his review including:

> PHS unpasted [posted] cash liability accounts are not reconciled…the unreconciled balances for both accounts totaled approximately $1 million….
> …
>
> Monthly Policy A/R transactions are not reconciled to general ledger interface and have not been in **approximately 15 years**. Accounting has historically written off balance to force reconciliations. See below note under PHS Accounts Receivable.
>
> Arnold Memorandum of Accounting Issues, pp. 4, 5 [Emphasis supplied].

74.  No later than April 2013, through memoranda and ongoing discussion with CHAN and Providence Hospital officials, Plaintiff-Relator made Providence Hospital officials aware that they were required to address these issues.

75.  Indeed, the first bullet point in his executive summary was "Compliance concerns over accounting criteria required for implementation and other matters as disclosed in email." Arnold Memorandum of Accounting Issues, p. 1.

76.  He also advised changes to the accounting/finance department including:

> Development/implementation of competent staff and resources to resolve accounting clean up and Symphony migration.  Once cleanup is complete, a strong accounting team will be required to meet organizational need going forward.

> Arnold Memorandum of Accounting Issues, p. 1.

77.  "Symphony" was supposed to be a business process transformation to a national processing center.

78.  This re-organization was supposed to help accounting processes and reduce staff needs for billing purposes.

79.  It was not implemented at the time of Plaintiff-Relator's audit and procedures for such a process to adhere to provider based billing requirements were not contemplated.

80.  Plaintiff-Relator noted that there was not even a full inventory of fixed assets.

81.  He recommended a "full balance sheet review of all entities to determine risk and potential implementation shortfalls." Arnold Memorandum of Accounting Issues, p. 2.

82.  He also recommended:

> CHAN A/P audit – policies and procedures need to be re-evaluated,

refined and implemented. A future monitoring process must be established to ensure adherence to the policies.

Arnold Memorandum of Accounting Issues, p. 2.

83.   Plaintiff-Relator's audit experience, and his dealings with Providence Hospital officials indicated to him that the hospital and affiliated organizations could not possibly be in compliance with provider-based billing requirements.

84.   He advised Providence Hospital officials of this issue and provided his memo to management.

85.   Instead of acting to improve Providence Hospital's practices, the Defendants removed Plaintiff-Relator.

### 2.   Specific line item errors discovered by Plaintiff-Relator

86.   In addition to the systematic billing and accounting issues, Plaintiff-Relator found specific line items in violation of law and regulations.

87.   For example, he found improper handling of FICA funds:

The FICA refund received by PH [Providence Hospital] from the IRS needs to be paid out to the Residents - a liability for $600K is on the balance sheet as April 30, 2013.

Arnold Memorandum of Accounting Issues, p. 2.

88.   As far as is known this FICA refund money was never properly distributed.

89.   Plaintiff-Relator noted problems with records of grants, including the Joslin Diabetes grant, which showed funds being used for construction or capital assets as opposed to grant purposes. Arnold Memorandum of Accounting Issues, p. 2.

90.   Plaintiff-Relator noted the need to amend the Foundation's tax Form 990 because of revenue and income being inflated by approximately $3 Million for one year.

91.   He recommended additional review of this issue. Arnold Memorandum of Accounting Issues, p. 2.

92.   He found "Deferrals from payroll ($65K) and employee match for 115 participant accounts were not accurate..." Arnold Memorandum of Accounting Issues, p. 2.

93.   Plaintiff-Relator identified a specific Stark law self-referral violation and noted that it was a possible violation of that law, when he questioned the "Appropriateness of forgiving physician loan receivables (beginning balance was $700K and balance as of 4/30 is approximately $200K...)." Arnold Memorandum of Accounting Issues, p. 3.

94.   Plaintiff-Relator found doctors under contract were overpaid and Providence Hospital forgave amounts of overpayments.

95.   The doctors were, therefore, not paid in accordance with the amount contracted for Providence Hospital.

96.   Plaintiff-Relator obtained an accounting schedule showing there was more than $900,000 of such overpayments for the fiscal year ended 7/1/2013.

97.   Plaintiff-Relator found a discrepancy of approximately Two Million Dollars in how revenue and expense were accounted in sleep centers.

98.   He said there was a need:

> [T]o properly state sleep center revenue and match revenue with deductions and expenses. Currently the gross revenue and expenses are on the books of PHS, and the deductions are on the books of PHS. Net impact approximates $2 Million and overstates PHS net income (with offsetting understatement on PH).
>
> Arnold Memorandum of Accounting Issues, p. 3.

99.   Each of the many specific line item issues, which Plaintiff-Relator identified, not only were matters of serious concern in and of themselves, but also re-enforced his conclusion that Providence Hospital and their affiliated clinics were not accounting for operations in a manner that could be in compliance with provider-based billing requirements.

### 3.   Provider-based revenue

100.   Provider-based billing allows for re-allocation of cost to a hospital facility resulting in increased reimbursement to the hospital.

101.   As a result, provider-based billing generates much higher revenue for the Defendants from government programs, than if they could not charge through this status.

102.   Plaintiff-Relator reviewed Medicare reimbursement rates and found that there was a huge impact on revenue.

103.   For example, a basic physician office visit in 2013 (CPT code 99213) generates charges in a freestanding clinic of $64.14.

104.   Such a service creates a provider-based facility charge "PBC" of $48.35 (APC technical component), in addition to $63.61 for the professional charges, which creates a total charge $111.96.

105.   Therefore, billing under this CPT code generates as a provider-based biller creates an extra 74.5% revenue or $47.82 in additional billing to Medicare for the same service.

106.   Providence Hospital and affiliated organizations acted knowingly to obscure accounting procedures, which led to these violations of regulation.

107.   Even after Plaintiff-Relator informed managers of the accounting and compliance issues, management of Providence Hospital took no action to correct the issues and instead fired the Plaintiff-Relator.

### 4.   Prime Pad, LLC violations

108.   David Faith, the Financial Planning and Analysis ("FPA") Director for Providence Hospital, was suspicious of agreements between Providence Hospital and "Prime Pad, LLC" involving rental contracts for Dr. Kwasi Debra. On or about February 2013, Mr. Faith told Plaintiff-Relator that the agreements appeared to be too expensive.

109.   Mr. Faith also expressed concern that the agreements could involve a kickback to Dr. Debra for referring patients within Providence Hospital's system.

110.   Mr. Faith asked Plaintiff-Relator to provide an opinion on the contract agreements.

111.   Plaintiff-Relator reviewed the contract(s) and they appeared to be clearly excessive in cost to Providence Hospital.

112.   There did not appear to be any commercial economic viability to the rental agreements.

113.   Both the Stark Law and the Anti-Kickback Statute require such leases to be related to the true market value of the rental property, to conform to any safe harbor exception. *See e.g.* 42 U.S.C. § 1395nn(e)(1)(A)(iv) requiring, "the rental charges over the term of the lease are set in advance, are consistent with fair market value..."

114. The leases involved time-share suites for rental and at high rates, which Plaintiff-Relator found to be clearly excessive.

115. The lease originally required rent of $5,000 per month for three examination rooms, but that rent covered only Tuesdays from 9AM-6PM, Wednesdays from 9AM-6PM and Fridays from 2PM-6PM.

116. Therefore, the rental covered half of a work week at most, making this an extremely expensive lease.

117. The lease was revised on April 1, 2013, eliminating the rental for Tuesdays and lowering the rate to $3,000 per month.

118. Therefore, Providence Hospital was renting three rooms for a total of twelve hours per week.

119. Dr. Debra claims to have supplied gauze and tongue depressors, but this hardly justified the rent payments.

120. Furthermore, clients were not informed of the financial relationship between this office and Providence Hospital.

121. Plaintiff-Relator went to the facility and found no indication of the financial relationship between Providence Hospital, Prime Pad, or Dr. Debra to alert patients to that fact.

122. The amounts involved persuaded Plaintiff-Relator that Mr. Faith was correct in suspecting a kickback for Dr. Debra to send Providence Hospital patients.

123. There was no other reason to pay such an excessive rent for a facility in which Providence Hospital doctors rarely practiced.

124.    Dr. Debra did refer patients to Providence Hospital, and there was no evidence at the Prime Pad offices of any disclosure, notifying patients of the financial relationship between the organizations, which is also in violation of provider-based billing. 42 C.F.R. § 413.65(d)(4).

125.    Plaintiff-Relator reported this to Mr. Faith, who said he would take it to the C.F.O., Mr. Talento, and to the Senior Vice President of Physician Health Services, Mr. Tahir.

126.    Mr. Faith reported that the C.F.O. scolded him for bringing the issue to Plaintiff-Relator's attention.

127.    In addition, Plaintiff-Relator was careful to report these findings to his chain of command within CHAN.

128.    In late April to early May 2013, Plaintiff-Relator discovered there were additional problems related to billing from the Prime Pad location. He found there were false bills generated, as if patients were being seen at this office when they could not have been seen there.

129.    Dr. Proctor was billing patients from the Prime Pad satellite location, while apparently being resident at the main hospital location, if he saw patients at all.

130.    By billing from the satellite location, assuming Dr. Proctor actually did see the patients, he would be able to charge a higher rate for services from the more expensive zip code.

131.    Providence Hospital would also be entitled to higher rates for technical component bills in this way.

132.    Plaintiff-Relator obtained evidence of these discrepancies.

133. For example, in 2013, Dr. Proctor was scheduled to see patients on September 20, October 4, 11, and 25, as well as on November 1, at the Prime Pad office located at 12200 Annapolis Road, Suite 123, Glendale, Maryland, 20769.

134. A comparison of the ECW calendar for Dr. Proctor, and a Glendale Meditec facility tracker report, revealed that patients who were on Dr. Proctor's schedule to be seen at that facility, never actually appeared in Glendale.

135. The Meditec facility tracking report indicated which patients signed in to be seen at that facility. ECW indicates who the doctor was scheduled to see. ECW Calendar and Meditec Facility Tracker Reports.

136. There was no indication on any documents of a cancellation by the patients or the doctor, and Plaintiff-Relator found that bills were generated as a result of these scheduled patients, as if they were seen at the Glendale facility.

137. The Plaintiff-Relator discussed this issue with Alex Sebion, Director of Physical Support and Practice Improvement at Providence Hospital, on or about February 19, 2014 around 12 p.m.

138. Mr. Sebion told the Plaintiff-Relator that Mr. Tahir ordered that bills were to be generated, as if from Glendale even if the patient was seen at Providence Hospital, while they worked things out.

139. After Plaintiff-Relator discovered this discrepancy, and others related to Prime Pad, LLC, officials of Providence Hospital prevented his further investigation.

### 5.    Additional audits find more evidence

#### i.    Another CHAN auditor expresses concern

140.   On or about September 20, 2012, Plaintiff-Relator met with Jill Seil Cruz a CHAN coding compliance manager/auditor.

141.   Ms. Seil Cruz expressed concern that her report had been influenced or changed from her initial draft by Mr. Fahad Tahir.

142.   She indicated that Plaintiff-Relator should review coding, as well as accounting issues at Providence Hospital.

143.   She stated she found significant issues with coding and financial accounting in review of Providence Hospital and affiliated systems, yet no action was taken to address these issues on a systematic basis once the audits showed they were prevalent.

### ii.   USAI outpatient coding compliance review

144.   United Audit Systems Inc. or "USAI" conducted an audit pursuant to an Outpatient Coding Compliance Review in January of 2013. (Hereinafter this audit report is referred to as "USAI Outpatient Coding Review.")

145.   USAI took a small sample of bills submitted by Providence Hospital and found an "accuracy rate" of 82%. USAI Outpatient Coding Review, p. 3.

146.   USAI reviewed records for 28 out-patient visits, which included 308 billing codes and found that 82% accuracy rate during July 2012.

147.   Yet, no re-payments had been made as of March 2013. USAI Outpatient Coding Review, p. 1, 3.

148.   The 82% accuracy rate was based on the number of coding errors found by USAI out of the number of coded events, which USAI reviewed. USAI Outpatient Coding Review, p. 1, 3.

149. However, the USAI report indicated that 28 *patients* generated the 308 charges.

150. Of those 28 patients, 12 had been subject to at least one billing error. USAI Outpatient Coding Review, p. 1, 3.

151. Therefore, more than 40% of the patients reviewed had at least one billing issue identified by this audit.

152. USAI found many issues with billing Providence Hospital, despite reviewing only a limited number of claims.

153. In its detailed findings, USAI stated:

> 1. Many of the claims reviewed did not have adequate documentation of the services provided to support the charges that were billed. These include:
>
> • Time documented on rehab procedure notes for therapeutic services.
>
> • Nursing documentation of blood being drawn through the patients implanted venous access device.
>
> • Infusion start and stop time documentation.
>
> Without these services being properly documented many of the charges reviewed were removed based on these findings.
>
> 2. Many of the claims reviewed did not have physician orders for the services provided.
>
> Each claim billed should be able to stand alone to support the services that were provided. Without adequate physician order documentation, the diagnosis and services ordered to be provided including dosage of pharmacy medications could not be validated as accurate or supporting medical necessity of that episode of care.
>
> 3. Nine claims were noted to have diagnosis coding errors. These should be reviewed and education provided to the coding staff.
>
> USAI Outpatient Coding Review, p. 3.

154.   USAI removing bills from the accounting ledgers, was tantamount to saying such billing should be removed because CMS should not have been billed, and medical documents from both nurse and doctors did not support the charge.

155.   Absent such documentation, medical necessity could not be established as required to bill under Medicare or Medicaid.

156.   Despite USAI's actions to provide a spreadsheet of claims that should be repaid even from this small sample, Providence Hospital actually failed to repay even these specific claims.

157.   USAI also effectively challenged the medical necessity of such claims by saying there was not "adequate documentation" to demonstrate medical necessity for those procedures.

158.   Medical necessity is an absolute condition of payment for Medicare and Medicaid claims.

159.   The audit provided a representative sample of charges.

160.   Providence Hospital did not confirm the accuracy of the full amount of charges it made to CMS based on this information as it should have done.

161.   The percentage of wrongful bills, according to this sample, would indicate a problem with approximately 18% of all Providence Hospital bills.

162.   While there was some attempt to review and repay these specific charges, there was no effort to handle the underlying issue they represented.

163.   There was no effort to determine how many wrongful bills and diagnoses charges were occurring hospital-wide, as a result of being informed by the audit of these

cases. Email Correspondence, Cartwright and Davis Jan 29, February 27, 28 and March 20, 2013.

### iii.   USAI physician practice coding compliance review

164.   USAI also conducted a review of Physician Practice Coding Compliance in January of 2013.   (Hereinafter this review is referred to as "USAI Physician Practice Review.")

165.   This USAI Audit shows an even worse accuracy rate, indicating a 58.33% (based on 25 E/M Codes changed out of 60 total E/M codes assigned). January 2013. USAI Physician Practice Review, p. 4.

### iv.   Hunter Partners Report

166.   Providence Hospital paid approximately one million dollars for a third party audit conducted by Hunter Partners.

167.   One of their findings on clinical productivity stated:

> Note: some of the APP[1] activity is attributed to the billing physician-it is likely that a greater volume of care was delivered by the APPs.

> Hunter Partners Report, p. 290.

168.   The audit effectively demonstrated that Providence Hospital was billing physician assistants as doctors.

169.   Hunter Partners obtained this information by reviewing documented patient notes and reviewing those who signed the notes to determine who was actually providing the service.

170.   One of the findings on administrative productivity stated:

---

1.   [1]An "APP" is a physician assistant.

It is unclear what the hospital CMO's responsibility is for the practices although under regulations, there should be a relationship.

There is no single physician leader for PHS.

Hunter Partners Report, p. 298.

171.  This confirmed Plaintiff-Relator's direct experience, that the Chief Medical Officer's authority was undercut by Mr. Tahir.

172.  Thus, there was no physician leader for Physician Health Services ("PHS"), the physician's group division within Providence Hospital, or a clear medical leader for satellite operations, which was a violation of provider-based billing regulations 42 CFR § 413.65(d)(1)(iii).

173.  The Hunter Partners' report indicated issues with accounting for physicians and other medical professionals' compensation:

> Sources and uses are not tied so patient care revenue is used for multiple purposes including medical directorships and teaching. In fact PHS does not have its own "payroll." Certain costs are allocated to PHS on the income statement including partial salaries for some physicians.

> Hunter Partners Report, p. 304.

174.  Lack of accounting for salaries and revenue goes to the heart of provider-based billing financial integration requirements and confirmed the Plaintiff-Relator's discovery of accounting mismanagement.

175.  Hunter Partners noted that its own ability to assess the data was compromised by Providence Hospital's failure to keep appropriate records:

> HP used the 2012 payroll files for physician compensation. Unfortunately the income statement combined all salaries (physician, APP and staff) so there was no ability to tie back the income statement. Likewise, benefits were reported only on a combined basis.

Hunter Partners Report, p. 305.

176. Hunter Partners had difficulty even determining who was providing what service and if the provider was qualified to do so:

> Although this list of providers was reconciled multiple times, it remained confusing as to who was a regular full or part time provider, and who was a PRN provider. It was assumed that if the provider was budgeted zero hours, they were PRR. This may not always be true. Many additions and departures were also challenging, though every attempt was made to reconcile the payroll list to the credentialing list of active providers, as well as billing data (from 3 systems), Lack of a common provider identified was a further obstacle.

Hunter Partners Report, p. 306.

177. Hunter Partners found payments made by individuals with no support for claims:

> In March 2013, there was $24,077 in payments without claims. The ability to track this also began with ECW. A lot of these are cash payments by patients. This indicates an issue with cash controls and reconciliation. It also raises the question as to how the organization is able to tie back to the G/L. Since June 2012 when tracking this data was initiated, there have been $2.2 Mil in payments without claims. Of this amount, $1.7 Mil was cash collections.

Hunter Partners Report, p. 338.

> NOTE: In FY12, Providence Hospital charges for emergency room visits for persons who were eventually admitted were classified in excess of 95% for levels IV and V (both A and B sides combined). Ironically, the physicians' professional codes in the level IV and V range were only 58% of their total billed emergency visit codes.

Hunter Partners Report, p. 351.

178. Hunter Partners cast aspersions on Providence Hospital admissions from the emergency room, stating that it would be a very high number of patients admissions, while a correspondingly low number were treated for higher-level physician services.

179.  Hunter Partners found miscellaneous costs to be excessive, indicating that true accounting of costs was undermined by hiding costs that should have been specifically assigned to a cost center into this designation:

> Miscellaneous Costs: At 6.71% of net revenue, PHS's miscellaneous operating costs are more than four times larger than the benchmarked level of 1.47%. In some institutions, general ledgers were originally intended for use in the acute care setting and, as a result, aren't necessarily equipped with the appropriate types of expense categories that describe the costs customarily incurred by a physician enterprise. In this case, many expenses get lumped into the "miscellaneous" category because a more granular classification of physician practice expenses doesn't exist.   This is the major reason HP strongly recommends the adoption of the MGMA[2] chart of accounts to allow for much greater granularity in describing and, ultimately, benchmarking a physician enterprise's operating costs against benchmarks.

> Hunter Partners Report, p. 363  [Underline as in original].

180.  Hunter Partners could not even perform an analysis of individual providers, because billing was not being conducted appropriately:

> With many new physicians and credentialing issues existing, activity is billed under other providers making it impossible to perform an analysis on an individual basis. Also APPs sometimes bill under their own names and sometimes under their supervising physician.

> Hunter Partners Report, p. 304.

181.  This finding impacts both the status as a provider based biller and undermines Providence Hospital's ability to establish the medical necessity of claims billed.

182.  Documentation of claims must be made on an individual basis so that the necessity of those claims can be established in order for such claims to be payable under government programs.

---

[2] MGMA refers to the national standards set by the Medical Group Management Association.

## IV.   VIOLATIONS OF THE FEDERAL AND STATE FALSE CLAIMS ACTS

### COUNT I
### Violations of 31 U.S.C. § 3729(a)(1)(A)
### Submitting or Causing the Submission of False Claims

183.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

184.   This is a claim for treble damages and civil penalties under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

185.   As demonstrated above, the Defendants knowingly presented and/or caused false claims to be presented to the United States for payment or approval.

186.   The false claims include, but are not limited to, knowingly billing using fees based on provider-based rates when the Defendants did not qualify for such status. Defendants not only fail to comport with regulations required to bill through this status, but also take active decisions regarding accounting, which make it impossible to attribute bills and revenue to appropriate cost centers. Defendants fail to bill in any appropriate manner and fail to correct billing errors.

187.   The Defendants do not follow provider-based requirements that satellite offices are directed by the same medical officers and clearly conform to the same medical management.

188.   Failures of documentation, improper accounting processes and coding procedures lead to bills submitted to Medicare and Medicaid, which cannot be demonstrated as medically necessary as well as bills submitted for services as if provided by doctors, which were provided by other medical personnel.

189. Defendants violate the Stark Law and Anti-Kickback statute through forgiveness of money owed to physicians, and improper rental agreements, which are not disclosed to patients, resulting in illegal referrals to Providence Hospital.

190. Defendants' accounting practices also lead to misappropriation of federal grant funding including, but not limited to, the Joslin Diabetes grant.

191. In addition, Defendants bill from satellite locations with higher reimbursement rates when the physicians were present in the main hospital, so that if the patient had been seen at all they would not have been seen at the satellite locations.

192. The Plaintiff-Relator's best evidence is that these practices are ongoing and continuous.

193. As a result of Defendants' continuing fraudulent and or illegal conduct, the United States has directly or indirectly paid numerous false claims.

194. Damages to the United States are ongoing and include, but are not limited to, the full amount paid on any such false claims and any related claims.

195. Defendant is liable to the United States for three times the full amount of these damages to be determined at trial.

196. Each and every such false claim is also subject to a civil fine under the False Claims Act of Five Thousand, Five Hundred Dollars ($5,500.00) to Eleven Thousand Dollars ($11,000.00), plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990.

## COUNT II
### Violations of 31 U.S.C. § 3729(a)(1)(B)
### Use of False Statements and False Certifications

197. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

198. This is a claim for treble damages and civil penalties under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

199. As set forth above, in furtherance of their illegal billing activities, Defendants knowingly created false records material to supporting false claims.

200. These false records include, but are not limited to, bills based on provider-based billing rates, when the Defendants did not qualify to bill for such rates, stating a physician saw a patient in a facility where that physician did not see the patient, bills for services for which medical necessity cannot be established or documented and grant funding documents.

201. As a result of Defendant's ongoing and continuing fraudulent and/or illegal conduct, the United States has directly or indirectly paid numerous false claims.

202. Damages to the United States are continuing and ongoing, and include but are not limited to the full amount it has paid on any such false claims.

203. Defendant is liable to the United States for three times the full amount of these damages. Each and every such false statement or record is also subject to a civil fine under the False Claims Act of Five Thousand Five Hundred Dollars ($5,500.00) to Eleven Thousand Dollars ($11,000.00), plus any increase as specified by the Federal Civil Penalties Adjustment Act of 1990.

**COUNT III**
**Violations of 31 U.S.C. § 3729(a)(1)(D) and (G)**
**Failure to Return Funds Belonging to the Government and**
**Concealing an obligation to the government**

204. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

205. This is a claim for treble damages and civil penalties under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(D) and (G).

206. Defendants were advised by Plaintiff-Relator and other auditors of many violations of billing requirements including, but not limited to, billing for provider-based rates to which they were not entitled, billing without documentation for medical necessity, inaccurate billing, and self-referral violations.

207. Although advised of these issues, they did not review their billing and did not return funds owed to the United States and concealed these issues in violation of the False Claims Act.

208. Damages to the United States are continuing and ongoing, and include, but are not limited to the full amount it has paid on any such false claims and/or not had money returned to the United States when Defendants should have acted to do so.

209. Defendant is liable to the United States for three times the full amount of these damages; each and every such false statement or record is also subject to a civil fine under the False Claims Act of Five Thousand Five Hundred Dollars ($5,500.00) to Eleven Thousand Dollars ($11,000.00), plus any increase as specified by the Federal Civil Penalties Adjustment Act of 1990.

## COUNT IV
### Violations of DC Code, §§ 2-381.01 *et seq.*
### The District of Columbia False Claims Act

210. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

211. This is an action for treble damages and civil penalties for violations of the District of Columbia False Claims Act, DC Code §§ 2-381.01 *et seq.*

212. As detailed above, through wrongful billing under provider-based rates, misrepresentations, improper referrals and improper billing procedures, the Defendants knowingly presented or caused to be presented false claims to the District of Columbia's Medicaid program and to other programs funded by the District of Columbia.

213. Defendants knowingly accomplished these unlawful acts by making, using, or causing to be used false records or statements.

214. The District of Columbia was not paid money owed when the Defendants discovered such false payments, was not informed of such false payments and these issues were concealed from rather than revealed to the District of Columbia.

215. The District of Columbia's Medicaid program and any additional program funded by the District of Columbia were unaware of the falsity or fraudulent nature of these claims. Such claims otherwise would not have been paid or allowed and payment would have been demanded.

216. By reason of these false claims the District of Columbia has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT V
### Violations of Md. Code Ann. Health-Gen. §§ 2−601 *et seq.*
### The Maryland False Health Claims Act of 2010 and
### Md. Code Ann. Gen. Prov. §§ 8-101 *et. seq.*
### The Maryland False Claims Act

217.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

218.    This is an action for treble damages and civil penalties for violations of the Maryland False Health Claims Act, Md. Code Ann. Health-Gen. §§2-601 *et seq.* and The Maryland False Claims Act, Md. Code Ann. Gen. Prov. §§ 8-101 *et. seq.*

219.    As detailed above, through wrongful billing under provider-based rates, misrepresentations, improper referrals and improper billing procedures, the Defendants knowingly presented or caused to be presented false claims to Maryland State health programs, and to other programs funded by the State of Maryland, as well as counties of the State of Maryland.

220.    Defendants knowingly accomplished these unlawful acts by making, using, or causing to be used false records or statements.

221.    Maryland state health programs the State of Maryland and counties of the State of Maryland, were not paid money owed when the Defendants discovered such false payments and were not informed of such false payments.

222.    These issues were concealed from, rather than revealed to, the appropriate governmental agencies.

223.    Maryland State health programs, any additional program funded by the State or counties of Maryland were unaware of the falsity or fraudulent nature of these

claims. Such claims otherwise would not have been paid or allowed and payment would have been demanded.

224.  By reason of these false claims, false statements, retaining the funds and concealing these issues, the State of Maryland and counties of the State of Maryland have been damaged and continue to be damaged in a substantial amount to be determined at trial.

## COUNT VI
### Violations of Va. Code Ann. §§8.01-216.1 *et seq.*
### The Virginia Fraud Against Taxpayers Act

225.  The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

226.  This is an action for treble damages and penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§8.01-216.1 *et seq.*

227.  Under the Virginia Fraud Against Taxpayers Act, the Defendants are liable for any false claim if the Commonwealth has provided any portion of the money. "Commonwealth" means the Commonwealth of Virginia, any agency of state government, and any political subdivision of the Commonwealth.

228.  As detailed above, through wrongful billing under provider-based rates, misrepresentations, improper referrals and improper billing procedures, Defendants knowingly presented or caused to be presented false claims to the Commonwealth of Virginia and to other programs funded by the Commonwealth.

229.  Defendants knowingly accomplished these unlawful acts by making, using, or causing to be used false records or statements.

230. The Commonwealth was not paid money owed when the Defendants discovered such false payments, was not informed of such false payments, and these issues were concealed from, rather than revealed to, the Commonwealth.

231. The Commonwealth's Medicaid program and any additional program funded by the Commonwealth were unaware of the falsity or fraudulent nature of these claims. Such claims otherwise would not have been paid or allowed and payment would have been demanded.

232. By reason of these false claims, the Commonwealth has been damaged and continues to be damaged in a substantial amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Relator, on behalf of himself, the United States, and all States listed herein request that judgment be entered in his favor and against Defendants as follows:

(a) That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*, and the counterpart provisions of the state statutes set forth above;

(b) That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more than Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729 plus any increase allowed for such civil penalties as specified under the Federal Civil Penalties Adjustment Act of 1990;

(c) That this Court also enter judgment against Defendants in the appropriate amount to each of the States for three times the amount of damages and civil fines as determined under the above listed State False Claims Acts;

(d) That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall not be less than fifteen percent (15%) nor more than thirty percent (30%) of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States, States and/or third parties;

(e) That Plaintiff-Relator be granted a trial by jury;

(f) That Plaintiff-Relator, the United States, and the States listed herein be awarded pre-judgment interest;

(g) That the Plaintiff-Relator, be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. §§ 3730(d) and similar provisions of the Sate False Claims Acts listed herein.

(h) That the United States, the States, Sub-divisions, Municipalities, and the Relator recover such other relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Respectfully submitted,

PRICE BENOWITZ, LLP

Anthony C. Munter
DC Bar No. 483823
409 7th Street NW, Suite 200
Washington, DC 2004
Email: tony@pricebenowitz.com

Phone: 202-417-6000
Fax:    202-664-1331


TULLY RINCKEY, PLLC


_Stephanie Rapp-Tully_

_____
Stephanie Rapp-Tully
DC Bar No. 1016900
815 Connecticut Avenue, NW, Suite 720
Washington, DC 20006
Email: srapptully@fedattorney.com
Phone: 202-787-1900
Fax:    202-640-2059 Fax

**April 6, 2016**